UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

C.R. by and through his parents and next friends, MARK AND KATHRYN RAINVILLE,

Plaintiff,

v.

EUGENE SCHOOL DISTRICT 4J, an Oregon public school district,

Defendant.

6:12-cv-1042-TC

ORDER

COFFIN, Magistrate Judge:

Plaintiff brings this action asserting violation of his First and Fourteenth Amendment rights against the Eugene School District. Plaintiff also alleges state law claims for defamation and negligence as well as retaliation for exercising his First Amendment rights. Defendant seeks summary judgment as to all claims and plaintiff seeks partial summary judgment as to his free

speech and due process claims.

On October 11, 2011, Vice Principal Katherine Kiraly prepared a request for administrative action suspending plaintiff for two days for the "general offense type," "Aggression/Harassment/Discrimination" and specific offense of "14.1 Harassment - sexual." Level III Request for Administrative Action (attached to Declaration of Kevin Brague (#s 25-27) as Exhibit 11). Kiraly listed the details of the incident as follows:

> [Plaintiff] along with some other boys verbally harassed two students with disabilities. One victim was a female hearing impaired, 6th grader, and one student was a 6th grade autistic male. The comments contained sexual connotations referring to blowjobs in connection to B.J.'s restaurant. [Plaintiff] admitted that the comments were inappropriate. It should be noted that the female student stated that she understood what the B.J. comment was referring to and did not feel safe.

Id. The form also noted "Administrative Comments Counseled student and contacted mother. Student will serve two days of OSS on 10/11/11 and 10/12/11. [Former principal] Peter Tromba met with parents on 10/10/11." Id. There is a further note that a parent was contacted on 10/7/11 and 10/10/11. Id.

Plaintiff's testimony demonstrates that over a few days, he walked home from school with some other kids and on the first day he gave them a fake name. On the second day, two of the boys started saying a bunch of "sexual things ... talked about blow jobs and BJ's. Kind of calling it that," and asked "do you watch porn and stuff like that." Deposition of C.R. at pp. 33, 36 (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 1). Plaintiff then stated "I like BJ's restaurant pizza, because they were kind of talking about BJ's restaurant." Id. at p. 36. Plaintiff "heard them say porn when they said BJs, but [he] just kind of really wasn't thinking." Id. Plaintiff states that the two impaired children "just said no" to "the porn thing." On the third day, plaintiff states that

he was 15 feet away from the impaired children when Tracy Parks, an instructional aid for children with learning disabilities, started yelling and asking the children if they felt safe. Id. at p 39. Plaintiff did not report the discussion about sexual things and blow jobs to anyone.

Tracy Parks states that when she saw the group of kids "it did not look friendly." Deposition of Tracy Parks at p. 15 (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 2). She asked the hearing impaired girl if she was comfortable and she replied that she was not and Parks asked the boys to leave. Id. Parks walked the rest of the way with the impaired children to make sure the boys did not return. Id. at 19. The hearing impaired girl told Parks that the boys were talking about BJs. When Parks asked her what that meant, the girl replied, "they said they meant the restaurant, but I thought it was something else." When Parks inquired further, the girl said she did not want to talk about it. Id. at p. 20. Parks recognized plaintiff because she was friends with his mother.

On the following Monday, Parks called vice principal Kiraly and reported that "there were a number of boys surrounding a young lady who was made to feel uncomfortable [because] they were talking about something that made her uncomfortable." Id. at pp. 21-22, 23. Parks specifically identified plaintiff. Vice principal Kiraly began an investigation.

Kiraly interviewed the two disabled students. Kiraly states that the girl told her that "she felt unsafe, that the comments were about BJ's, both the restaurant and then Ben and Jerry's, BJ's Ice Cream. She mentioned swearing." Deposition of Katherine Kiraly at p. 47. (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 3). Kiraly did not recall if the girl specifically identified plaintiff. The autistic male student did not specifically identify plaintiff either.

Vice principal Kiraly also interviewed plaintiff, once by herself and once with former

principal Tromba. She interviewed the other boys involved separately. The other male students involved said plaintiff was involved in the incidents. Id. at p. 66. Kiraly states that plaintiff later told her that he said that he likes BJ's restaurant and said his name was Bill or Bob. The other boys involved told her that when they were talking about BJ's restaurant and Ben and Jerry's Ice Cream Parlor, all understood that they were talking about blow jobs including the female student. Id. at p. 67. She further stated that she did not recall having a specific conversation with plaintiff using the word "blow job." She also noted that plaintiff understood that the two impaired students were "different or at least one was different." Id. at p. 68.

Former principal Tromba recalls that in his first interview, plaintiff didn't admit to anything, said he was not involved and didn't know anything. Deposition of Peter Tromba at p. 33 (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 4). Tromba understood that plaintiff admitted to the comment about BJ's restaurant after the other boys had been interviewed. Id. at pp. 39-40.

Tromba recalled about the context of the incidents:

> My recollection, particularly to what [plaintiff] admitted to, was making comments to the kids about BJ's Restaurant and something else that had BJ as an abbreviation. It wasn't BJ's Restaurant. It was something else.
>
> And that the understanding of everybody that we interviewed -- most everyone that we interviewed was that this was referring to blow jobs and the students who were surrounding the two sixth graders, who were of somewhat limited capacity to understand things, were getting them to talk about BJs and they were laughing at them and saying -- I remember one statement, for instance, "A BJ is something that you" -- "It's a sandwich that you can enjoy by yourself, but it's really better to enjoy it with another person."
>
> And there were a number of comments about BJs and what a number of the kids -- because I interviewed one other student -- and there were some other students that were interviewed -- that was typical kind of seventh grade stupid stuff, but trying to refer to blow jobs by talking about BJs.
>
> Secondly, the students were trying to get the two sixth grade students to

> repeat cuss words, get them to say different cuss words. Some of them were sexual; some of them weren't. And then I believe there were comments about the two of these people like going to the restaurant together like as a couple. So "Why don't you take her to BJ's or she can take you to BJ's," or something like that. So sort of sexualizing the environment for these little sixth grade kids.

Id. at pp. 31-33.

After the first interview with plaintiff, both Kiraly and Tromba told plaintiff not to discuss the interview with the others whom he identified as being present so as not to impede the investigation. Id. at p. 77. However, the other students told vice principal Kiraly that plaintiff told them about the interview and plaintiff later admitted that he had told one of the others. Deposition of C.R. (attached to #39 as exhibit 1) at p. 47 ("I ... told him--we were being kind of talking about how stupid--how we were going to get in trouble because we really didn't do anything wrong.")

Plaintiff states that he had a second longer interview with Kiraly and Tromba in which "they wanted the whole story." Id. at p. 46. Notes of the interviews indicate that after plaintiff admitted to the BJ's restaurant comment and that he knew it was inappropriate he was asked why he didn't admit it the first time. The notes show that plaintiff replied "I didn't remember anything ... most of it at first." Exhibit 5 to the Amended declaration of Blake H. Fry (#39).

Plaintiff told his mother that he had been accused of something that he did not do and that she needed to call vice principal Kiraly. Deposition of Kathryn Rainville (attached to the Amended declaration of Blake H. Fry (#39) as exhibit 7) at p. 27. According to plaintiff's mother, Kiraly told her that plaintiff had been "accused and convicted in their mind of sexual harassment of handicapped children." Id. Kiraly then told her that he was going to be suspended. Id. at p. 28. However, plaintiff's mother and father were permitted to meet with Kiraly and former principal Tromba before the decision was made. Id. at pp. 28-29. After a 40 minute meeting, the parents were informed that

plaintiff would be suspended for two days. Id. at pp. 33-35.

On November 6, 2011, former principal Tromba wrote an e-mail to plaintiff's mother in which he indicated that plaintiff's suspension and length of suspension was based on: his participation in sexual harassment; his not being forthcoming when he was first interviewed; his identifying another student as harassing, but claiming he did nothing; his being told there would be consequences if they discovered he had not been truthful; and his talking to the other students about the interview when told not to tell them. Exhibit 6 to the Amended declaration of Blake H. Fry (#39) at p. 1.

Plaintiff's parents told him to write an apology letter to the parents of the disabled children. In that letter, plaintiff stated that he was

> very sorry I didn't stand up for your kids. I was walking home with some people and they started to harass them and I stood there and accidently intimidated them. It was wrong not to stand up to them and tell the people to stop.
>
> I'm also sorry for lying about my name for about a minute. It's a joke I have used since first grade. I didn't mean to harass your kids and I'm very sorry about it.
>
> I've learned lots about harassment and have paid the price for my actions. I'm sorry that I scared your kids and I will never do it again.

Deposition of C.R. (attached to #39 as Exhibit 1) at pp. 79-80. Plaintiff testified that he didn't think he was intimidating, but his dad was mad and said he was intimidating them. Id. at p. 80.

Plaintiff also wrote a letter intended for former principal Tromba (which was not delivered) in which he stated

> I'm sorry that I intimidated those kids. I'm also sorry that I told my friend that I was in the office when I shouldn't have. And lied to you.
>
> This experience has helped me learn that if someone is harassing someone to tell them to stop and report it. Also to not lie and treat everyone the way I want to be treated. Sexual harassment is very wrong and disrespectful.
>
> I'm sad that you think I was the leader of this group even though I wasn't. And you think that I would lead people to harass handicapped children. I read about

harassment in the school handbook and learned not to gang up on people.

Next time if -- next time -- I think I said if I see or hear harassment I will report it immediately and tell the person to stop.

Id. at pp. 81-82.

Again plaintiff noted that he did not think he was intimidating and that his father is sorry that he did not trust him. Id. at 82.

Plaintiff sent a records request to the District on December 9, 2011. On March 22, 2012, plaintiff sent a tort claim notice to former principal Tromba.

An incident report from April of 2012 indicates that the school suspended plaintiff, in school, for one day on April 20, 2012. Declaration of Kevin Brague (#s29-33) at exhibit 18. The report includes a description of "Theft - major," and the narrative states:

[Plaintiff] stole a paperclip from a teacher. When he shared this with other students, they took the idea and proceeded to steal over 2 zip-lock bags full of items from her classroom.

Id.

Tromba describes the incident as follows:

[Plaintiff's teacher] Ms. Schmieding reported at some point that some personal effects of hers, which included gifts from family members, had disappeared from her classroom. And that a student had reported to her -- I believe reported to her -- it could be reported to another staff member -- that they knew that those personal effects had been stolen.

And my recollection is that [plaintiff] stole a paper clip from her and then told his friends about it. And other friends stole other stuff. And [plaintiff], as well as other kids, were aware of -- or participated in burying those personal effects, which included things from family members, in a hole on the school grounds. So he took something from Ms. Schmieding; pretty minor thing, and then participated with those kids in burying those personal effects off campus.

....

... His suspension -- he was aware of all of the effects that had been stolen and where they were buried. And he also stole something pretty trivial. But it's really the fact that he was aware of other thefts that had occurred and where these things had

been buried.

Deposition of Peter Tromba (attached to #39 as exhibit 4) at pp. 66-68.

Plaintiff states that after he took the paper clip he:

> Went up to my friends. I go: Oh, I'm such a badass. I have a paper clip, kind of thing.
> ....
> And then they started stealing a whole bunch of stuff.

Deposition of C.R. at pp. 59-60 (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 1).

Plaintiff admitted he gave the others the paper clip to bury and that it was big joke. Id. at p. 63. Plaintiff stated that other students were suspended as well, some may have been suspended for two days. Id.

Plaintiff alleges that: the District violated his right to freedom of speech by suspending him for protected speech (outside of school hours and property) that was not offensive or harassing; the District deprived him of his property and liberty interest in school and sullied his reputation in violation of his due process and substantive due process rights; the District defamed him by publishing the belief that he sexually harassed disabled children; the District retaliated against plaintiff for his speech; and the District was negligent in punishing him for his speech and conduct that occurred outside of school boundaries and hours.

A review of the briefing in this case demonstrates that despite the label of free speech, what plaintiff really seeks through this litigation is to second guess defendant's conclusion, after an investigation, that plaintiff harassed the disabled students. Plaintiff in essence seeks a de novo

factual review of what occurred. As plaintiff's counsel put it, "He is suing the Eugene School District because they suspended him for sexual harassment of two sixth grade students with disabilities--something he did not do." Plaintiff's Response (#28) at p. 3. This court cannot entertain plaintiff's invitation to impanel a jury to conduct a de novo hearing regarding the incidents that were the subject of the District's investigation and decision. Alleging claims for ostensible constitutional violations is not an opportunity to re-litigate from scratch what occurred.

A. First Amendment Free Speech Claim

In essence, plaintiff's theory is that the District suspended him and retaliated against him for his opinion about an area restaurant. The parties agree that the analysis for this claim is controlled by Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 (1969). "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513. While the location of the speech can make a difference, off-campus speech is within the reach of school officials. Wynar v. Douglas County School Dist., __ F.3d __, 2013 WL 4566354 at *4 (9th Cir. August 29, 2013). When faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of Tinker. Id. Students also may be suspended for off-campus sexually explicit and degrading comments about female classmates. S.J.W. v. Lee's Summit R–7 Sch. Dist., 696 F.3d 771 (8th Cir. 2012). For off-campus speech, the test still remains whether school officials may forecast substantial disruption of or material interference with school activities or whether speech collides with the rights of other

students to be secure and to be let alone in the school environment. Wynar, 2013 WL 4566354 at *6.

This material disruption or invasion of rights standard does not require that the school authorities wait until an actual disruption occurs; where school authorities can "reasonably portend disruption" in light of the facts presented to them in the particular situation, regulation of student expression is permissible. LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001) ("Tinker does not require school officials to wait until disruption actually occurs before they may act."). "School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." Lowery v. Euverard, 497 F.3d 584, 596 (6th Cir. 2007).

In this case, the district reasonably believed that bullying and harassment could lead to more problems and substantial disruptions. In addition, it reasonably forecast that failure to discipline harassing behavior could create a climate welcoming to such behavior in school. More importantly, the harassment itself, occurring just off school grounds where students regularly traverse en route to and from school, invades the rights of other students.

While plaintiff makes a tortured argument that he engaged in no harassment, no reasonable trier of fact could conclude that the district did not reasonably find that he did. Indeed, plaintiff himself admitted he heard his companions say porn when they said BJs, but claimed he really wasn't thinking when he made his statement about BJ's restaurant. The other boys involved, however, indicated that in talking about BJ's restaurant and Ben and Jerry's Ice Cream Parlor, all understood that they were talking about blow jobs including the female student. Vulgar, lewd, obscene, indecent, and plainly offensive speech may well impinge upon the rights of other students, even if

the speaker does not directly accost individual students with his remarks. Chandler v. McMinnville School Dist., 978 F.2d 524, 529 (9th Cir. 1992). The female student told Parks that she felt uncomfortable and told the vice principal that she felt unsafe. It is simply not reasonable to conclude that the District disciplined plaintiff for the content of his statement about his preference for a restaurant rather than the sexually harassing connotation attached to the conduct by the boys involved. Defendant is entitled to summary judgment on plaintiff's First Amendment Free Speech claim.

B. Due Process

Plaintiff alleges that the District failed to provide him with due process when suspending him. Specifically, plaintiff contends he was not given notice of the sexual harassment charges against him and opportunity to deny them. However, the failure to categorize the infraction does not constitute a due process violation. All that is required is oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. Goss v. Lopez, 419 U.S. 565, 581 (1975).

"There need be no delay between the time 'notice' is given and the time of the hearing." Id. at 582. The school may informally discuss the "alleged misconduct" and then only need give the student an opportunity to explain his version of the facts. Id. The student only needs to be told what he is accused of doing and the basis of the accusation. Id. The school in this case conducted extensive interviews over a few days and even interviewed plaintiff twice and confronted him with

what the other students said he had done.[1] Then the school, as plaintiff himself noted, asked him for the "whole story." The school also met with plaintiff's parents and plaintiff's mother noted that she was told plaintiff was accused of "sexual harassment of handicapped children." Regardless of whether plaintiff seeks to vindicate a property or liberty interest through his due process claim, no reasonable fact finder could conclude that the school did not tell plaintiff what alleged misconduct he was accused of doing and the basis of the accusations, or that he was not given an opportunity to explain his version of the facts.

Plaintiff also alleges a substantive due process violation now asserting that the decision by the school was arbitrary. Even assuming plaintiff has properly alleged a substantive due process claim and harm, and that under the facts of this case he can bring such a claim under 42 U.S.C. § 1983, there is no legitimate dispute that the school had a rational basis for determining that plaintiff engaged in the harassing behavior for which he was disciplined. See Sagana v. Tenorio, 384 F.3d 731, 742–43 (9th Cir.2004) (A plaintiff can make out a substantive due process claim if the alleged harm is caused by government actions that were arbitrary and lacking a rational basis).

The motion for summary judgment as to the due process claim is granted in favor of defendant.

C. Retaliation

It is important to note that the complaint alleges, despite reference to the paragraphs in the statement of the case section, only that plaintiff engaged in protected speech opining about a

---

[1]Indeed, plaintiff admits he knew the school was concerned about how the two disabled students were treated, i.e., that they may have been harassed. Deposition of C.R. at p. 48 (attached to Amended Declaration of Blake H. Fry (#39) as exhibit 1)

restaurant and the District punished him for it with the two suspensions. Plaintiff's briefing in response to and in support of the summary judgment motions now attempts to add a retaliation claim for his parents' protestations of his punishment and for generally continuing to oppose the suspension. Plaintiff cannot raise such allegations for the first time in response to summary judgment. See Wasco Products, Inc. v.. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) ('[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.").

To prove a claim for retaliation under the First Amendment, plaintiff must show: (1) a loss of a benefit or privilege caused by the retaliatory conduct; (2) plaintiff was engaged in constitutionally protected speech; and (3) the protected speech was a substantial motivating factor for the adverse action. Ulrich v. City and County of San Francisco, 308 F.3d 968, 976 (9th Cir. 2002). As noted above, it is absurd to conclude that the school sought to punish plaintiff for the content of speech that merely praised the pizza at a local restaurant. Further, as noted, plaintiff was not engaged in protected speech when he engaged in the harassing conduct for which he was punished. Plaintiff can do more than speculate that he was punished for his speech. There is no factual support, sufficient to defeat summary judgment, that the school was motivated to suspend plaintiff, on either occasion, for protected speech. The motion for summary judgment is granted in favor of defendant as to plaintiff's retaliation claim.[2]

D.   State Law Defamation and Negligence Claims

Similar to plaintiff's retaliation claim and substantive due process claim, plaintiff's

---

[2]Because plaintiff cannot establish any of his constitutional claims, the court need not address whether he can establish the District's liability under Monell.

defamation claims are moving targets with new theories and claims arising in the face of the summary judgment motions. Accordingly, the court declines to exercise jurisdiction over these claims given that the claims over which the court has original jurisdiction will be dismissed.

CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (#20) is granted and plaintiff's motion for partial summary judgment (#24) is denied. Accordingly, this action is dismissed and all other pending motions are denied as moot.

DATED this 12 day of September, 2013.

THOMAS M. COFFIN
United States Magistrate Judge